IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHRISTINE J. BLOOM, individually,)
etc.,                             )
                                  )
              Plaintiff,          )    No.  11 C 5536
                                  )
       v.                         )
                                  )
PALOS HEIGHTS POLICE DEPARTMENT,  )
et al.,                           )
                                  )
              Defendants.         )

MEMORANDUM OPINION AND ORDER

Christine Bloom ("Bloom") has sued the Palos Heights Police
Department, two of its named officers (Chris Hodorowicz
("Hodorowicz") and Jeff Marran ("Marran")) and various unknown
officers of the Police Department and Fire District (collectively
the "Officers"), the Palos Heights Fire Protection District
("Fire District"), the Palos Community Hospital ("Hospital") and
Patricia Mamone and Anthony Mamone for injuries stemming from an
incident in which the Mamones reported (falsely according to
Bloom) a suicide attempt by her daughter, S.B.  On November 1,
2011 Bloom voluntarily dismissed the Hospital.  All remaining
defendants have filed motions to dismiss under Fed. R. Civ. P.
("Rule") 12(b)(6), and the litigants have briefed the matter.
For the reasons stated here, all of the motions are granted--
albeit on differing grounds--and both this action and the Amended
Complaint are dismissed.

## Rule 12(b)(6) Standards

Under Rule 12(b)(6) a party may move for dismissal of a complaint on the ground of "failure to state a claim upon which relief can be granted." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 562-63 (2007) was the first case to repudiate, as overly broad, the half-century-old Rule 12(b)(6) formulation announced in <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957) "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." And post-<u>Twombly</u> cases have further reshaped a new Rule 12(b)(6) standard.

First <u>Twombly</u>, 550 U.S. at 570 held that to survive a Rule 12(b)(6) motion a complaint must provide "only enough facts to state a claim to relief that is plausible on its face." Or put otherwise, "[f]actual allegations must be enough to raise a right of relief above the speculative level" (<u>id</u>. at 555). Then <u>Erickson v. Pardus</u>, 551 U.S. 89 (2007) (per curiam) and <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009) provided further Supreme Court enlightenment on the issue.

Before <u>Iqbal</u> our own Court of Appeals, in <u>Airborne Beepers & Video, Inc. v. AT & T Mobility LLC</u>, 499 F.3d 663, 667 (7th Cir. 2007) described <u>Twombly</u> and <u>Erickson</u> as establishing "only that at some point the factual detail in a complaint may be so sketchy

2

that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8." And more recently <u>Brooks v. Ross</u>, 578 F.3d 574, 581 (7th Cir. 2009) has confirmed that the <u>Airborne Beepers</u> reading of pleading law post-<u>Twombly</u> and post-<u>Erickson</u> remains accurate after <u>Iqbal</u>. <u>Brooks</u>, <u>id</u>. describes <u>Iqbal</u> as "admonishing those plaintiffs who merely parrot the statutory language of the claims that they are pleading (something that anyone can do, regardless of what may be prompting the lawsuit), rather than providing some specific facts to ground those legal claims, that they must do more."

Familiar Rule 12(b)(6) principles--still operative under the new pleading regime--require this Court to accept as true all of Bloom's well-pleaded factual allegations, with all reasonable inferences drawn in her favor (<u>Christensen v. County of Boone</u>, 483 F.3d 454, 457 (7th Cir. 2007)(per curiam)). What follows in the next section adheres to those principles.

**Facts**

S.B. is Bloom's 15 year-old daughter (AC ¶2)[1]. N.M. is the Mamones' son (<u>id</u>. ¶¶8-9). N.M. and S.B. dated each other in early 2011, but the Mamones did not approve of the relationship and tried to keep their son from seeing S.B. (<u>id</u>. ¶15).

---

[1] All citations to Bloom's Amended Complaint will take the form "AC ¶--." Bloom filed multiple memoranda in response to defendants' motions to dismiss. Citations to each of her memoranda will appear as "B. Mem. --" preceded by the 2011 filing date of the memorandum.

On May 6, 2011 N.M. was at the Bloom house (AC ¶13).
Patricia Mamone drove to the house to pick up N.M. and called him
on his cell phone to let him know that she had arrived (id. ¶16).
Patricia and N.M. began to argue on the phone, and N.M. refused
to leave the house (id.).  Anthony Mamone then called his son,
precipitating another argument (id. ¶17).  Those arguments caused
S.B. to become upset (id. ¶18).  She ran into the kitchen, and
N.M.--now back on the phone with Patricia--told Patricia that
S.B. had made comments about cutting herself (id. ¶¶18-20).
Paradoxically, N.M. also told Patricia that she should not call
911 (id. ¶20).  S.B. did not actually cut herself (id. ¶22).
According to AC ¶21, N.M. and S.B. then sat down on the couch,
and though S.B. "was still upset and emotional" she "was not in
any physical danger to herself of anyone else."  No AC
allegations say whether N.M. or the Mamones or anyone else knew
that.

Patricia called 911 (AC ¶26).  Bloom says that Patricia told
the dispatcher that the situation was not serious (id.).
Whatever else Patricia told the dispatcher, it prompted the
dispatcher to call for both a psychological evaluation from the
Fire District and for a police unit to come to the Bloom house
(id. ¶27-28).  Officers arrived at the house and spoke to
Patricia (id. ¶29-30), who told them that S.B. was contemplating
suicide and had a knife to her throat (id. ¶30).  But the Mamones

4

had a personal connection to some Police Department personnel
(the AC does not say whether Hodorowicz or Marran were among
them), and the AC goes on to state that the Mamones spoke to the
latter two Officers upon their arrival at the Bloom home (id.
¶¶124-25).  Both the Mamones and the Officers assertedly agreed
on a plan to take her to the Hospital whether or not it was
necessary (id. ¶127).

Hodorowicz, Marran and possibly other Officers entered the
Bloom house without knocking and without a warrant (AD ¶32).
They found S.B. and N.M. sitting on a couch in the living room
(id. ¶33).  No knife was in the living room (id. ¶33).  S.B. told
the officers that she was not trying to commit suicide (id. ¶34),
but the Officers removed S.B. from her home against her will,
strapped her to a gurney and took her to the Hospital (id. ¶¶35-
40).  At the Hospital the Officers did not make an application
for admission of S.B. to a mental health facility for inpatient
treatment under 405 ILCS 3/503 (id. ¶¶42-43).

Someone attempted to reach Bloom on her cell phone, but
Bloom's phone lost reception and the call was cut off (AC ¶¶45-
46).  Bloom eventually learned that S.B. was at the Hospital and
met her there at 6:40 p.m. (id. ¶¶47-49).  S.B. then underwent a
psychiatric evaluation (id. ¶50), and she was discharged around
11:30 p.m. (id. ¶51).

**Bloom's Legal Theories[2]**

Bloom lists fully 14 legal theories that she says entitle
her to relief, either on her own behalf or on behalf of S.B.
Those legal theories overlap:  For example, Bloom says that 42
U.S.C. §1983[3] allows her to recover against the Officers, the
Police Department, the Fire District and the Mamones.  But the
Section 1983 analysis differs for each set of defendants, so this
opinion is organized in terms of the theories' applicability to
the different defendants:  the Officers, the Police Department,
the Fire District and the Mamones.

**Theories Against Individual Police Officers and Does**

Bloom asserts that a host of statutes and common law
doctrines entitle her to relief against Hodorowicz, Marran and
the Doe defendants:

---

[2]  This is the accurate way to speak of Bloom's legal
onslaught, rather than the common but erroneous characterization
of such theories as "claims" (see <u>NAACP v. Am. Family Mut. Ins.
Co.</u>, 978 F.2d 287, 291-93 (7th Cir. 1992)).  Even so, this
opinion later sometimes employs the "claim" terminology (with
apologies, of course) for two reasons:

1.  Many of Bloom's contentions are advanced under state
law, which employs the "cause of action" concept because a
legal theory is part of that concept.  Such contentions
sometimes constitute separate "claims" in the purest sense
of the word.

2.  That being so, maintaining a strict differentiation in
this opinion would be both cumbersome and awkward.

[3]  Further references to Title 42 statutes will take the
form "Section --," omitting reference to Title 42 itself.

- Section 1983 for violation of her Fourteenth Amendment right to substantive due process
- Section 1983 for violation of her Fourteenth Amendment right to equal protection
- Section 1983 for an unlawful entry under the Fourth Amendment.
- Intentional infliction of emotional distress
- "Conspiracy"
- Section 1985(3)
- Excessive force
- Negligence

On behalf of S.B., Bloom asserts all of those theories except for the substantive due process theory, as well as adding:

- Section 1983 for violation of S.B.'s Fourteenth Amendment right to procedural due process
- Section 1983 for an unlawful seizure under the Fourth Amendment
- Section 1983 for false arrest
- False imprisonment
- Battery
- Assault

Let's start with the due process claims. Bloom contends that the Officers violated her right to familial relations, an assertion that comes under the rubric of substantive due process. Protection of familial relations is indeed a fundamental right, but a brief separation of a parent from her child does not deprive the parent of her right to raise children. That's the conclusion reached by <u>Tenenbaum v. Williams</u>, 193 F.3d 581, 600-01 (2d Cir. 1999) as to a seizure of similar duration. There a caseworker removed a kindergartner from class and brought her to a hospital because the caseworker suspected the child had been abused by her father (<u>id</u>. at 590). Hospital workers examined the child, found no sign of abuse and returned the child to her

parents that same day.  When the parents sued claiming that the seizure of the child denied them their fundamental right to familial relations, <u>Tenenbaum</u>, 193 F.3d at 600-01 held that such right is not abrogated by temporarily removing a child from a parent's care (<u>id</u>. at 601):

> The temporary separation of [the child] from her parents did not result in the Tenenbaums' wholesale relinquishment of their right to raise [the child].

In our own Circuit, <u>Hanson v. Dane County</u>, 608 F.3d 335, 338-39 (7th Cir. 2010) has reached a similar conclusion, albeit on different facts.  Police officers were called to a family's home and suspected a case of domestic violence.  They took the children to a separate room for questioning.  <u>Hanson, id</u>. at 338-39 held that the right to familial relations is abrogated by breaking up a family, not by a brief separation (<u>id</u>. at 338 (citation omitted)):

> Although "familial relations" are fundamental, the police did not break up the Hanson family; they just asked some questions of the daughters to learn whether a crime had occurred.

Here Bloom alleges that she arrived at the Hospital less than an hour after her daughter (AC ¶¶41, 49), and she points to no case that holds a separation of that duration intrudes on a parent's fundamental right.  Hence the AC fails to state a claim for an interference with Bloom's fundamental right to familial relations.

On S.B.'s behalf Bloom seeks relief in procedural due process terms, but that fares no better. Bloom says that upon arriving at the Hospital the Officers were required to complete an application to admit S.B. under 405 ILCS 5/3-503 and 5/3-504.[4] Bloom misreads the statutes. Here is Section 504(b), which Bloom says the Officers violated by failing to complete an application:

> A peace officer may take a minor into custody and transport the minor to a mental health facility when, as a result of his personal observation, the peace officer has reasonable grounds to believe that the minor is eligible for admission under Section 3-503 and is in a condition that immediate hospitalization is necessary in order to protect the minor or others from physical harm. Upon arrival at the facility, the peace officer shall complete an application under Section 3-503 and shall further include a detailed statement of the reason for the assertion that immediate hospitalization is necessary, including a description of any acts or significant threats supporting the assertion, the time and place of the occurrence of those acts or threats, and the names, addresses and telephone numbers of other witnesses of those acts or threats.

But those procedures apply only when "immediate hospitalization is necessary." Section 112 defines "hospitalization" as "the treatment of a person by a mental health facility as an inpatient," and S.B. was <u>not</u> admitted to the Hospital for treatment as an inpatient. As <u>People v. R.C.</u>, 175 Ill. App. 3d 163, 167, 529 N.E.2d 756, 759 (1st Dist. 1988)

_____

[4] Further reference to those and related provisions will take the form "Section --," omitting the prefatory 405 ILCS 5/3. That usage should create no confusion with citations referred to in n.3, given the wide difference in numbering between the Title 42 provisions and the ILCS provisions.

states:

> Absent a specific legislative definition of when a
> patient is "admitted," we believe that a reasonable
> interpretation of the statutory language "prior to
> admission" allows for a potential patient to be taken
> to a hospital and within a reasonable amount of time
> thereafter be examined and processed to determine
> whether that person should be formally admitted.

Thus the statute, as interpreted by Illinois courts, differentiates between preliminary examinations and outright admissions for treatment. S.B. underwent the former but was never formally admitted. And that being so, the statute did not require the Officers to complete any paperwork.

What has been said to this point has assumed arguendo that violating the statute would deprive S.B. of due process. But violations of state statutes, even if they contain procedural rules, do not necessarily violate the Due Process Clause. As Goros v. County of Cook, 489 F.3d 857, 859 (7th Cir. 2007) has put it:

> State law defines property; federal law defines the
> process that is "due."

Due process usually calls for notice and a hearing (id. at 860), but Bloom does not argue that S.B. was entitled to a hearing before being transported to the Hospital and examined. Instead, citing Kraushaar v. Flanigan, 45 F.3d 1040 (7th Cir. 1995), Bloom argues that the state law created a liberty interest that the Officers took from S.B. by not following the procedure mandated by that law. Kraushaar itself has reiterated the

rejection of that sort of bootstrapping (id. at 1049)(citations

to source omitted, brackets and ellipses in original):

> [S]tate procedural protections cannot define what
> process is due. The Fourteenth Amendment's limitation
> on state action would be illusory indeed if state
> practices were synonymous with due process....[T]he
> task of defining the procedural protections
> which attach to [a protectable liberty interest] is wholly a
> matter of federal constitutional law and is accom-
> plished through the balancing analysis of Matthews v.
> Eldridge, 424 U.S. 319 (1976).

Even if the Officers had violated the statute (which the evidence

does not support), Bloom would not have a viable due-process-

based remedy.

Bloom also argues that she can invoke Section 1985(3)

because the Officers conspired with the Mamones to deprive her

and S.B. of equal protection of the law.  Section 1985(3)

prohibits conspiracies to deprive a person of her legal rights,

but only when the conspirators have "a racial or otherwise class-

based invidious discriminatory animus" (Nowicki v. Ullsvik, 69

F.3d 1320, 1325 (7th Cir. 1995))--and here the AC gives no

indication that the Officers' and Mamones' actions were based on

Bloom's or S.B.'s membership in any class.

To be sure, in her October 25 memorandum Bloom says that the

Mamones and Officers targeted her and S.B. because they are

female.  But Bloom's AC contains no such allegation.  Instead the

AC ascribes the Mamones' motivation to the fact that they did not

like their son's dating S.B.:

15.  Prior to May 6, 2011, S.B. and N.M. had been
dating each other for approximately 5 months and had
seen each other on a fairly regular basis.  The Mamones
do not approve of their son being seriously involved in
a relationship with S.B. and had repeatedly attempted
to keep them apart from each other and/or maintained
tight control over the circumstances in which N.M. was
permitted to see S.B. outside of school hours.

                    *          *          *

        25.  Upon information and belief, the Mamones
decided to call 911 in an effort to harass, embarrass
and humiliate S.B. and/or to continue their attempts to
keep S.B. and N.M. apart from each other.

    As Nowicki indicates, even though the Supreme Court has

never clarified precisely what kinds of discrimination other than

race-based discrimination can implicate Section 1985 (see United

Bhd. of Carpenters v. Scott, 463 U.S. 825, 835-38 (1983)), the

statute does not cover discrimination based on ordinary

disagreements between citizens (cf. Griffin v. Breckenridge, 403

U.S. 88, 102 (1971), holding that Section 1985 is not "a general

federal tort law").  Because Bloom's pleading does not allege any

class-based discrimination,[5] she has failed in her attempt to

call upon Section 1985(3).

    Bloom's Equal Protection Clause effort, which advances a

_____

        [5]  Something must be said about Bloom's belated effort to
inject alleged sex discrimination into the case.  When any lawyer
(or any client) simply changes the facts because the law demands
something other than what the original version of the facts will
provide, that dubious tactic brings Rule 11(b) into play--and it
is difficult to ascribe any other motive for the new assertion in
this case.  Bloom's counsel is ordered to submit an appropriate
affidavit from Bloom on or before January 16 identifying any good
faith predicate for the change in theories.

"class-of-one" theory, also fails.  <u>Srail v. Vill. of Lisle</u>, 588

F.3d 940, 944 (7th Cir. 2009) explains that to make out a class-

of-one claim, a plaintiff must "establish that there exist

comparators with whom [he is] similarly situated."  Bloom's AC

contains no allegation that the Officers treat similarly situated

individuals differently.  Bloom says in one of her memoranda of

law that she could allege that one individual who posed a suicide

risk was not taken to the hospital.  Even if the AC had contained

such an allegation (as it has not--in that respect, see n.5),

that would not do the job.  It is obvious that every such

situation has its own dynamics--that one size does not fit all.

Here is what <u>Engquist v. Or. Dep't of Agric.</u>, 553 U.S. 591, 603

(2008) says on that score:

> There are some forms of state action, however, which by
> their nature involve discretionary decisionmaking based
> on a vast array of subjective, individualized assess-
> ments. In such cases the rule that people should be
> "treated alike, under like circumstances and
> conditions" is not violated when one person is treated
> differently from others, because treating like
> individuals differently is an accepted consequence of
> the discretion granted.  In such situations, allowing a
> challenge based on the arbitrary singling out of a
> particular person would undermine the very discretion
> that such state officials are entrusted to exercise.

To turn next to Bloom's Fourth-Amendment-based contentions,

they pose a common issue:  whether the police were legally

justified in entering Bloom's home and seizing S.B.  <u>Brigham City

v. Stuart</u>, 547 U.S. 398, 403 (2006) says that "law enforcement

officers may enter a home without a warrant to render emergency

13

assistance to an injured occupant or to protect an occupant from imminent injury." Hence legal justification exists if the Officers had a reasonable belief that S.B. was going to harm herself (<u>Siliven v. Ind. Dep't of Child Servs.</u>, 635 F.3d 921, 927 (7th Cir. 2011)). Most of the allegations in the AC suggest that they did. Patricia called the police and told them that S.B. was contemplating suicide and had a knife to her throat (AC ¶30). That's surely enough for a reasonable officer to believe that S.B. was in danger of harming herself.

Bloom counters that Patricia's information was false--that S.B. never held a knife to her throat. And the AC alleges that when the police entered the home, they saw no knife and no signs of disturbance (AC ¶33), and S.B. told them that she had no intention of committing suicide (<u>id</u>. ¶34)[6] But probable cause and exigent circumstances inquiries are based on what the officers believed at the scene and "do[ ] not demand probability, or even a showing that the officer's belief is more likely true than false" (<u>Siliven</u>, 635 F.3d at 927 (internal quotation marks

---

[6] Though she did not allege this in the AC, Bloom has just asserted--in her fourth memorandum of law--that S.B.'s adult siblings were present when the Officers arrived and told the officers "that no exigent circumstances existed" (Dec. 22 B. Mem. 9). Once again such a tactic is inexcusable--as n.5 states, it raises a serious question as to whether what is going on is an effort to reshape the facts to fit the way that the legal issues seem to be developing. But that aside, the quoted summary is too amorphous to be useful in determining what the Officers knew at the scene. Bloom does not say how much the adult siblings witnessed and to what extent they contradicted Patricia's story.

omitted)).  For legal purposes the ultimate truth of Bloom's statements is irrelevant--the Officers were justified in bringing S.B. to the Hospital if a prudent officer, confronted with Patricia's statements and the other facts and circumstances at the scene, could have believed that S.B. constituted an immediate danger to herself (id.).

Bloom wants a rule that requires the Officers to have trusted S.B. over Patricia.  In fact the Officers did not completely put their faith in either, deferring instead to mental health professionals at the Hospital (AC ¶35).  That was a reasonable judgment in light of what they understood to be S.B.'s threat to cut herself (AC ¶20).  On that score Hanson, 608 F.3d at 338 holds that "officers who have probable cause need not cancel an investigation on request."

Here the Officers had reason to believe that S.B. had threatened to harm herself, and they were not required to stop investigating when S.B. told them that nothing was amiss.  They acted reasonably under the circumstances by turning to professionals, rather than forming their own lay opinions about S.B.'s mental health.[7]  Consider for a moment the possible consequences of the Officers acting solely on their own lay

---

[7]  Threats of suicide must be taken seriously, and the danger is not necessarily dissipated by the apparent subsidence of the threat--for example, such persons can and do paper over the problem by feigning calmness, only to return to that dangerous mindset when another stressor arises.

opinions and leaving the scene. Had S.B. actually been suicidal,

such conduct by the Officers would have created a risk to her

life. Briefly seizing her and bringing her in for an expert

evaluation was reasonable in light of that potential risk (cf.

Siliven, 635 F.3d at 928).

It is true that Bloom also says that the police conspired

with Mamones to seize S.B. without justification. To that end

she cobbles together a set of allegations, beginning with AC

¶124's vague and generalized allegation:

> Upon information and belief, Defendants A. Mamone
> and/or P. Mamone had a personal connection or
> relationship and/or influence over employees of the
> PHPD [the Police Department].

Even though any reference to Hodorowicz and Marran is

conspicuously absent from that allegation, just as there is no

basis for the notion that the unidentified police personnel

somehow communicated a desire to assist the Mamones to those two

officers before they were called to the Bloom residence by the

police dispatcher, Bloom continues with the assertion that upon

arriving there the Officers conspired with Mamones to remove S.B.

from the house even though there was no "reasonable basis or

probable cause for doing so" (AC ¶127).

It is an understatement to label that combination of

allegations as wildly fanciful. During the Conley v. Gibson era

of Rule 12(b)(6) jurisprudence, this Court would on occasion

quote from Denton v. Hernandez, 504 U.S. 25, 33 (1992):

> Some improbable allegations might properly be disposed
> of on summary judgment, but to dismiss them as
> frivolous without any factual development is to
> disregard the age-old insight that many allegations
> might be "strange, but true; for truth is always
> strange, Stranger than fiction."  Lord Byron, Don Juan,
> canto XIV, stanza 101 (T. Steffan, E. Steffa & W. Pratt
> eds. 1977).

But as to such a tangled web of allegations as Bloom has served

up, there is good reason to believe that the overly generous

Denton statement has been overtaken by the new Twombly-Iqbal

requirement that a pleading "state a claim to relief that is

plausible on its face" (Twombly, 550 U.S. at 570; Iqbal, 129 S.

Ct. at 1949).

It is worth noting that the allegations that the Supreme

Court found wanting in Twombly had, in conclusory fashion,

asserted a conspiracy without adequate factual support (Twombly,

550 U.S. at 567), while Bloom asserts in like conclusory fashion

a conspiracy allegedly hatched in a brief discussion between the

Officers and Mamones (AC ¶¶124, 127).  In sum, even if the Denton

approach would require this Court to accept Bloom's strange

allegations, it is questionable whether that would suffice to

make Bloom's conspiracy claim plausible after Twombly and Iqbal.

But that possible conflict need not be resolved here, for

Bloom's contention fails for a different reason.  Bloom alleges

that the Officers and Mamones "agreed on a plan whereby

Defendants Hodorowicz, Marran and/or John/Jane Does would remove

S.B. from the residence and transport her to PCH, regardless of

whether any reasonable basis or probable cause existed for doing so" (AC ¶127).  Bloom thus argues that the Officers had a bad motive for seizing S.B. and transporting her to the Hospital. But the definitive Fourth Amendment reading in <u>Whren v. United States</u>, 517 U.S. 806, 812-13 (1996) is that the constitutional reasonableness of a search or seizure does not "depend[ ] on the actual motivations of the individual officers involved" (<u>id</u>. at 213).  What controls instead is an objective rather than subjective standard:  whether a reasonable officer could make the seizure under the same circumstances.

As explained earlier, a rational and objective officer brought to the scene by a report that someone had threatened self-mutilation or suicide and finding the situation apparently defused would have opted, just as Hodorowicz and Marran did, to bring S.B. to mental health experts for further evaluation, rather than run the earlier-described risk.  Even if this Court--despite the <u>Twombly</u>-<u>Iqbal</u> caveat--were to accept Bloom's bizarre conspiracy allegations, then, she fails to state a claim.

That leaves only the various state law theories, whose resolution depends heavily on issues of state law.  Because the federally-grounded theories against the individual Officers have been dismissed, this Court will exercise its discretion to decline supplemental jurisdiction over the state law claims under 28 U.S.C. §1367(c)(3).

18

## Theories Against Municipal Defendants

Bloom contends that she has Section 1983 theories of recovery against the Police Department and Fire District, the same state-law-based theories listed above against the individual defendants, plus state law theories on a respondeat superior basis. Those categories will be dealt with seriatim.

To begin with, Bloom's Section 1983 contentions are dead on arrival. As for the Police Department, a non-entity in the legal sense, it is not a "person" capable of being sued under Section 1983, so it is out of the case. But because the Fire District is a municipal unit (70 ILCS 705/1), it requires more discussion.

Although the seminal opinion in <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 690-91 (1978) held that municipal units are "persons" capable of being sued under Section 1983, the opinion went on to say (<u>id</u>.) that municipalities are liable only for official policies and customs that cause constitutional torts; see also <u>Vodak v. City of Chicago</u>, 639 F.3d 738, 747 (7th Cir. 2011)). Here are the allegations of AC ¶¶70 and 71:

> 71. Defendants PHPD [Police Department] and PHFPD [Fire District] are government entities that had a custom or policy that resulted in the deprivation of Plaintiffs' constitutional rights and the rights afforded by the Emergency Admission of Minor statute.

> 72. Defendants PHPD and PHFPD knew or should have know that their custom or policy of failing to train its [sic] employees and/or of failing to enforce their established rules regarding compliance with the Emergency Admission of Minor Statute would result in a deprivation of Plaintiffs' constitutional rights.

19

Little analysis is required to demonstrate that those paragraphs are not enough to plead a custom or policy adequately.

As for AC ¶70, it is a "conclusory legal statement" that does "nothing to distinguish the particular case that is before the court from every other hypothetically possible" <u>Monell</u>-based theory of recovery (<u>Swanson v. Citibank, N.A.</u>, 614 F.3d 400, 404-05 (7th Cir. 2010)). It thus fails to provide the Fire District the notice required by Rule 8 (<u>Brooks,</u> 578 F.3d at 581).

Nor does AC ¶71 fare better. <u>Twombly</u> and <u>Iqbal</u> require a plaintiff to "give enough details about the subject matter of the case to present a story that holds together" (<u>Swanson</u>, 614 F.3d at 404). Bloom failed to do that. She has mentioned only one potential custom or policy--an asserted failure to train employees or failure to enforce compliance with an Illinois statute--but she makes no attempt to explain how those asserted failures could be a proximate cause of the claimed commission of constitutional violations.

<u>Montano v. City of Chicago</u>, 535 F.3d 558, 570 (7th Cir. 2008) states that a plaintiff must establish that the municipality's "<u>deliberate</u> conduct"--its custom or policy--was the "moving force" behind the constitutional deprivation. But Bloom's pleading contains no allegation that connects the asserted failure to train the Officers on the Illinois statute with the constitutional violations for which she contends.

That leaves only the state law theories against the Fire
District:  intentional infliction of emotional distress,
negligence and excessive force. Those contentions, which can be
advanced against the Fire Department only in respondeat superior
terms, lack any federal underpinning at this point.  They are
dismissed without prejudice to their possible assertion in a
state court of competent jurisdiction.[8]

## Theories Against Mamones

Finally, Bloom brings state law claims of intentional
infliction of emotional distress, conspiracy and negligence, plus
a Section 1985(3) theory, against the Mamones.  For the reasons
previously given, the Section 1985(3) theory is dismissed.  That
then leaves the state law contentions, which are dismissed
without prejudice in the same manner as those same contentions
vis-a-vis the Fire District.

## Conclusion

To summarize the disposition of Bloom's many theories of
recovery:

1.  Bloom's theories against the Officers are
dismissed, with the dismissal of the state law torts being
without prejudice.

2.  All of the Section 1985(3) theories, both against

---

[8]  No view is expressed here as to the substantive merit (or
lack of merit) in those contentions.

the Mamones and against the Officers, are dismissed.

        3.  All of Bloom's theories against the Police
Department are dismissed, because it is not a "person"
capable of being sued.

        4.  All of her theories against the Fire District are
dismissed, with the dismissal of the respondeat-superior-
based theories that derive from state law torts being
without prejudice.

        5.  All of the state law theories against the Mamones
are dismissed, also without prejudice.
All of that, then, dispatches the AC in its entirety.

        Most often a dismissal at the pleading stage does not close
out a case, on the premise that a repleading might cure the flaws
that have been identified.  Here, however, Bloom has
unquestionably given it her best shot--although doing so with
fatally wet powder has prevented that attempted shot from
reaching any legal target.  That being so, no do-over is
appropriate, and this action is dismissed with prejudice (save
for the limited without-prejudice dismissals described earlier).

                                _____
                                Milton I. Shadur
                                Senior United States District Judge

Date:  January 4, 2012